IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

-------------------------------------------------------------------X

VINCENT SIMMONS,
Plaintiff,

-- against --

THE AVOYELLES PARISH POLICE JURY, AVOYELLES PARISH DISTRICT ATTORNEY'S OFFICE, FABIUS ANTHONY DIDIER, as the successor of the Succession of FABIUS "POTCH" DIDIER, individually and as Sheriff of Avoyelles Parish; LISA SAUCIER JUNEAU and BEAU FLOYD JUNEAU, as the successors of the Succession of FLOYD JUNEAU, individually and as a Deputy Sheriff of Avoyelles Parish; ROBERT LABORDE, individually and as a Deputy Sheriff of Avoyelles Parish; BARBARA DECUIR-WALKER, individually and as a Deputy Sheriff of Avoyelles Parish; THE UNOPENED SUCCESSION OF BURTON DAUZAT, individually and as a Deputy Sheriff of Avoyelles Parish; THE UNOPENED SUCCESSION OF CAPT. MELVIN VILLEMERETTE, individually and as a Deputy Sheriff of Avoyelles Parish; THE UNOPENED SUCCESSION OF JOHN LABORDE, individually and as Avoyelles Parish Assessor; THE UNOPENED SUCCESSION OF MARILYN LARSON BORDELON, as the successor of the Succession of DR. FILMORE PAUL "F.P." BORDELON, individually and as Avoyelles Parish Coroner; JEROLD EDWARD "EDDIE" KNOLL, individually and as Avoyelles Parish District Attorney; ALICIA JEANETTE THERIOT KNOLL, individually and as an Assistant District Attorney of Avoyelles Parish; CHARLES ADDISON RIDDLE III, individually and as District Attorney of Avoyelles Parish; JOHN/JANE DOE NOS. 1 through 20, being unknown officers, employees and/or agents of the Parish of Avoyelles; JOHN/JANE DOE NOS. 21 through 40, being unknown officers, employees and/or agents of the Avoyelles Parish District Attorney's Office; and ABC INSURANCE COMPANIES 1-10,

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Defendants.

-------------------------------------------------------------------X

For his Complaint against the above stated Defendants in their individual and official capacities, Plaintiff Vincent Simmons, by and through the undersigned attorneys, avers as follows:

## INTRODUCTION

1. Plaintiff Vincent Simmons spent more than 44 years in Louisiana state prison, most of that time in solitary confinement, for two rapes that he didn't commit. In 1977, Simmons, a young black man in his twenties living in Avoyelles Parish, was accused of raping twin sisters Sharon and Karen Sanders. Not only were the accusations against Simmons inconsistent and self-contradictory – in fact, in all likelihood and as the sisters later admitted to a relative, they were sexually molested by their cousin Keith Laborde – but a medical examination would later show that no rape ever took place. But none of that mattered.

2. This was rural Louisiana in a different time, not long after Jim Crow. The Parish of Avoyelles was still segregated in all but name, and an accusation that a black man had raped two teenage white girls triggered the deep-seated "rape myth" which was foundational to Jim Crow culture. Once the accusation was made, a conviction had to be secured, no matter the cost – and one was. Moreover, two of the defendants in this case, with powerful positions as parish assessor and deputy sheriff, were named Laborde, and with family honor at stake, they collaborated under color of law with their fellow officers to ensure that Simmons was put away.

3. As will be discussed below, Defendants immediately went to work to ensure that Simmons would be convicted regardless of the weakness of the evidence and indeed regardless of his innocence. Defendants coached and outright fed the Sanders sisters their stories; subjected Simmons to a "lineup" in which he, and no other participants, were in handcuffs; physically

assaulted Simmons and even shot him when he refused to confess; systematically suppressed any evidence casting doubt on Simmons' guilt; and ensuring that, rather than a fair trial, he endured a fabricated farce whose outcome was guaranteed from the outset.

4. Every part of official Avoyelles Parish was involved in this. The Sheriff's Department defendants, overseen and directed by defendant Didier, coached the Sanders sisters in getting their stories straight, set up the farcically unconstitutional "lineup," suppressed any contradictory statements, committed the physical assaults on Simmons, and perjured themselves at trial. The District Attorney's Office defendants participated fully in the "investigation" of the case, stepping outside their role as prosecutors to take an active part in the fabrication of evidence. In this they were helped by defendant John Laborde as parish assessor and Dr. Filmore Paul "F.P." Bordelon as medical examiner, the latter of whom failed to disclose the medical examination he conducted and which confirmed that a rape had never even happened.

5. Even after Simmons was convicted and sentenced to 100 years in prison – 44 years of which he served, at the notorious Angola penitentiary – the assault on his civil rights did not end; instead, the same energy that was devoted to putting him in jail now focused on keeping him there. Only long after trial was Simmons able to obtain the evidence showing how the case against him was built on a tissue of lies, and then, through more lies, defendants denied that it had ever been suppressed in the first place. Only in 2021, when Simmons was finally able to get an actual court hearing on his claim of innocence, did the truth about *that* come out, and it was finally established that he had never had even a ghost of the judicial process to which he was entitled as a citizen. It was shortly after this, in February 2022, that Simmons was finally exonerated and released, having lost more than 44 irreplaceable years of his life.

6. For these reasons, as more fully alleged below, each of the individual defendants

must be held liable for violating plaintiff Simmons' rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the equivalent clauses of the Constitution of the State of Louisiana, and each of the municipal defendants is likewise liable because the acts complained of were committed by a final policymaker and/or pursuant to customs and practices including but not limited to the rape myth. Moreover, defendants' acts also amount to the torts of malicious prosecution, false imprisonment, and intentional infliction of emotional distress under Louisiana law. Plaintiff Simmons thus prays for compensatory and punitive damages in an amount to be determined by a jury and for such other and further relief as may seem just and proper.

## THE PARTIES

7. Plaintiff VINCENT SIMMONS is a natural person who at all times relevant to this lawsuit resided in the Western District of Louisiana.

8. Defendant THE AVOYELLES PARISH POLICE JURY is, and was at all times relevant to this lawsuit, a Parish of the State of Louisiana having the powers and duties conferred by law.

9. Defendant AVOYELLES PARISH DISTRICT ATTORNEY'S OFFICE is, and was at all times relevant to this lawsuit, a governmental body of the Parish of Avoyelles and/or the State of Louisiana, having the powers and duties conferred by law.

10. At times relevant to this lawsuit, FABIUS "POTCH" DIDIER is being sued in his individual and official capacities for actions taken as Sheriff of Avoyelles Parish and the final policymaker of the Avoyelles Parish Sheriff's Department; however FABIUS "POTCH" DIDIER is deceased and his succession has been accepted by FABIUS ANTHONY DIDIER, in a ***Judgment of Possession*** dated July 9, 2008, in the matter captioned "Succession of Julia Dickerson Didier

and Fabius Odell Didier, Jr.", Probate Number 2007-90171, on the docket of the 12th Judicial District Court, Parish of Avoyelles, State of Louisiana; accordingly, FABIUS ANTHONY DIDIER is being made a party defendant and being sued for all wrongful conduct done by FABIUS "POTCH" DIDIER in any individual and official capacities as Sheriff of Avoyelles Parish and the final policymaker of the Avoyelles Parish Sheriff's Department.

11. At times relevant to this lawsuit, FLOYD JUNEAU, is being sued in his individual and official capacities for actions taken as a Deputy Sheriff of Avoyelles Parish; however FLOYD JUNEAU is deceased and his succession has been accepted by LISA SAUCIER JUNEAU and BEAU FLOYD JUNEAU, in a ***Judgment of Possession*** dated March 9, 2004, in the matter captioned "Succession of Floyd P. Juneau", Probate Number 2004-0773, on the docket of the 12th Judicial District Court, Parish of Avoyelles, State of Louisiana; accordingly, LISA SAUCIER JUNEAU and BEAU FLOYD JUNEAU are being made a party defendants and being sued for all wrongful conduct done by FLOYD JUNEAU in any individual and official capacities as a Deputy Sheriff of Avoyelles Parish.

12. At times relevant to this lawsuit, defendant ROBERT LABORDE was a Deputy Sheriff of Avoyelles Parish, and is being sued herein in his individual and official capacities.

13. At times relevant to this lawsuit, defendant BARBARA DECUIR-WALKER was a Deputy Sheriff of Avoyelles Parish, and is being sued herein in her individual and official capacities.

14. At times relevant to this lawsuit, BURTON DAUZAT, is being sued in his individual and official capacities as a Deputy Sheriff of Avoyelles Parish; however, BURTON DAUZAT is deceased and his succession has not been opened; accordingly, THE UNOPENED SUCCESSION OF BURTON DAUZAT is being made a party defendant and is being sued for all

wrongful conduct done by BURTON DAUZAT as a Deputy Sheriff of Avoyelles Parish.

15. At times relevant to this lawsuit, CAPT. MELVIN VILLEMARETTE is being sued in his individual and official capacities as a Deputy Sheriff of Avoyelles Parish; however, CAPT. MELVIN VILLEMARETTE is deceased and his succession has not been opened; accordingly, THE UNOPENED SUCCESSION OF MELVIN VILLEMARETTE is being made party defendant and being sued for all wrongful conduct done by CAPT MELVIN VILLEMARETTE as a Deputy Sheriff of Avoyelles Parish.

16. At times relevant to this lawsuit, JOHN LABORDE, is being sued in his individual and official capacities as the Avoyelles Parish Assessor and the final policymaker of the Avoyelles Parish Assessor's office; however, JOHN LABORDE is deceased and his succession has not been opened; accordingly, THE UNOPENED SUCCESSION OF JOHN LABORDE is being made a party defendant and being sued for all wrongful conduct done by JOHN LABORDE in any individual and official capacities as the Avoyelles Parish Assessor and the final policymaker of the Avoyelles Parish Assessor's Office.

17. At times relevant to this lawsuit, DR. FILMORE PAUL "F.P." BORDELON is being sued in his individual and official capacities for actions taken as the Avoyelles Parish Coroner; however DR. FILMORE PAUL "F.P." BORDELON is deceased and his succession has been accepted by MARILYNN LARSON BORDELON, in a ***Judgment of Possession*** dated November 19, 2007, in the matter captioned "Succession of Filmore Paul Bordelon, Jr.", Probate Number 2007-901720, on the docket of the 12th Judicial District Court, Parish of Avoyelles, State of Louisiana; however, MARILYNN LARSON BORDELON passed this life on April 11, 2012 and her succession has not been opened; accordingly, THE UNOPENED SUCCESSION OF MARILYN LARSON BORDELON is being made a party defendant and being sued for all

wrongful conduct done by DR. FILMORE PAUL "F.P." BORDELON in any individual and official capacities as the Avoyelles Parish Coroner and the final policymaker of the Avoyelles Parish Coroner's Office.

18. At times relevant to this lawsuit, defendant JEROLD EDWARD "EDDIE" KNOLL was the Avoyelles Parish District Attorney and the final policymaker of the Avoyelles Parish District Attorney's Office, and is sued herein in his individual and official capacities.

19. At times relevant to this lawsuit, defendant ALICIA JEANETTE THERIOT KNOLL was an Assistant District Attorney and/or First Assistant District Attorney of Avoyelles Parish and is sued herein in her individual and official capacities.

20. At times relevant to this lawsuit, defendant CHARLES ADDISON RIDDLE III was the Avoyelles Parish District Attorney and the final policymaker of the Avoyelles Parish District Attorney's Office, and is sued herein in his individual and official capacities.

21. Defendants JOHN/JANE DOE NOS. 1 through 20 are, and were at times relevant to this lawsuit, officers, employees and/or agents of the Parish of Avoyelles whose identities are not presently known but whose acts and omissions harmed the Plaintiff.

22. Defendants JOHN/JANE DOE NOS. 21 through 40 are, and were at times relevant to this lawsuit, officers, employees and/or agents of the Avoyelles Parish District Attorney's Office whose identities are not presently known but whose acts and omissions harmed the Plaintiff.

23. At all times relevant to this lawsuit, the above-named defendants acted within the course and scope of their employment and under color of state law, to wit, the law of the State of Louisiana.

24. At all times relevant to this lawsuit, the above-named defendants acted in concert with each other and with others not named.

25. Defendants ABC INSURANCE COMPANIES 1-10 are insurance companies who, at times relevant to this lawsuit, insured one or more of the above-named defendants for losses and/or liabilities alleged herein.

## JURISDICTION AND VENUE

26. This action arises under the laws of the United States, and jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over claims arising under state law is invoked pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

27. Venue in the Western District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b), because it is the district in which many defendants reside, and because a substantial part of the events or omissions giving rise to the claims occurred within the Western District of Louisiana.

## FACTUAL ALLEGATIONS

28. On May 23, 1977, Petitioner Vincent Simmons was arrested and charged with the rape of Sharon and Karen Sanders in Avoyelles Parish. It was alleged that the rapes occurred on May 9, 1977, after the Sanders twins' first cousin, Keith Laborde, agreed to give Simmons a ride home. About six miles out of Marksville on a deserted stretch of Little California Road, or so the story goes, Simmons produced a gun, locked Laborde and Karen in the trunk while he raped Sharon, and then locked Sharon in the trunk while he raped Karen. Ultimately, after threatening them, he let them go.

29. These accusations stunk from the beginning. Keith Laborde, as was well known at the time, was a racist who would never talk familiarly with or give a ride to a black man like Simmons, and Little California Road in the 1970s was the heart of Klan country where no black

man would venture to go for fear of being killed. Moreover, Sharon and Karen, when they got home on the night in question, said nothing about being raped.

30. Nevertheless, on May 22, 1977, defendant John Laborde, the assessor of Avoyelles Parish and the father of Keith Laborde, called the Avoyelles County Sheriff's Department to report the rapes.

31. Upon information and belief, as will be discussed below, defendant John Laborde knew full well that far from being raped by a black man, Karen, who was under aged at the time, had in fact been sexually molested by Keith Laborde, who was an adult at the time; however, with family honor and his son's freedom at stake, defendant John Laborde used his power and influence as assessor to conceal the fact that Keith Laborde was the molester and to steer the Sheriff's Department and District Attorney's Office in a different direction, namely toward plaintiff.

32. On May 23, 1977, defendant Juneau requested and obtained an arrest warrant for no particular person for the rape of Karen and Sharon Sanders. This warrant did not name Vincent Simmons.

33. Simmons was arrested "on view," without probable cause, and with knowledge of his innocence, by defendant Robert Laborde, who upon information and belief was a relative of Keith Laborde and the Sanders sisters.

34. Post-arrest, defendant Robert Laborde processed Simmons, pressured Simmons to confess, and physically assaulted and indeed shot Simmons when he refused to admit guilt.

35. Following the arrest, at approximately 9:05 a.m., defendant Didier, then the Avoyelles Parish Sheriff, sent deputies for the twins, who were picked up at school.

36. Defendants, including but not limited to defendants Didier, Robert Laborde, and Decuir-Walker, specifically stated to the girls that they were going to view a lineup that included

the person who had raped them.

37. Defendant Didier then instructed defendant Villemerette to select seven males from the jail for a lineup.

38. In direct consultation with and under the direction of defendant Didier, defendant Villemertte selected fillers that included a white person as well as several black men who did not look like Simmons.

39. A card was pinned to the shirt of each person in the lineup in the following order: #1. Joseph Sampson, #2 Charles Hubbard, #3 Malone Alexander, #4 Vincent Simmons, #5 Steve Williams, #6 Peter Johnson, #7 Melvin Eldridge, and #8 Raymond Gauther, the only white suspect.

40. Defendants Didier and Villemerette directed that Simmons be handcuffed before being placed in the lineup, and that none of the fillers be handcuffed.

41. The lineup was then conducted by defendants Villemerette, Robert Laborde, and Decuir-Walker.

42. Defendants Villemerette, Robert Laborde, and Decuir-Walker allowed the Sanders sisters and Keith Laborde into the viewing room together and allowed them to talk with each other before identifying Simmons.

43. Defendants Didier, Villemerette, Robert Laborde, and Decuir-Walker did not disclose to Simmons or his counsel anything concerning the manner in which the lineup was conducted, including but not limited to the aforesaid, nor did they disclose a lineup photo which clearly shows that Simmons, and none of the fillers, were handcuffed during the lineup.

44. As a further part of the investigation of the case, defendant Bordelon conducted a medical examination of the Sanders sisters.

45. This examination showed not only that Sharon Sanders' hymen was intact but that

its condition was inconsistent with her being forcibly raped at all, which would result in some anatomical evidence of injury to the hymen.

46. Defendant Bordelon, acting as final policymaker for the Avoyelles Parish Medical Examiner's office, suppressed this report and did not disclose it to plaintiff Simmons or to his counsel.

47. Defendants including but not limited to defendants Didier, Decuir-Walker, Robert Laborde, Juneau, Dauzat, Eddie Knoll, and Jeanette Knoll interviewed the Sanders sisters and Keith Laborde and took statements from them.

48. In their initial typed statements, neither Keith Laborde nor the Sanders sisters mentioned the name "Simmons" – indeed, Sharon referred to the alleged rapist only as "the n--r."

49. Nor did Sharon or Karen Sanders initially mention the date May 9, 1977.

50. Moreover, unlike the testimony that they would later give at the hearing and trial, Sharon's and Karen's accounts differed markedly about events surrounding the alleged rapes, e.g., the positions they were put in, whether they were vaginally and/or anally penetrated, whether marijuana was involved, and the description of the alleged perpetrator.

51. Defendants including but not limited to defendants Didier, Decuir-Walker, Robert Laborde, Juneau, Dauzat, Eddie Knoll, and Jeanette Knoll, systematically coached Keith Laborde and the Sanders twins to identify Simmons by name and to get their stories straight about when and how the alleged rapes had happened, thus fabricating false evidence against Simmons.

52. Defendants including but not limited to defendants Didier, Decuir-Walker, Robert Laborde, Juneau, Dauzat, Eddie Knoll, and Jeanette Knoll, suppressed and did not disclose to Simmons the typewritten reports in which Keith Laborde and the Sanders sisters gave statements inconsistent with their later testimony.

53. On June 10, 1977, the Grand Jury of Avoyelles Parish returned an indictment charging Simmons with two counts of what was then termed aggravated rape (La. Rev. Stat. § 14:42) as aforesaid. The indictment was later amended to charge Simmons with two counts of attempted aggravated rape.

54. This indictment was procured by defendants and each of them without probable cause and by fraud and suppression of evidence; specifically, through the false and fabricated lineup and statements aforesaid, and through suppression of the details of the lineup, the contradictory statements of the alleged victims, and the Bordelon medical report.

55. At a preliminary hearing held on July 11, 1977, Sharon and Karen, under the coaching of the defendants, gave almost exactly identical testimony as to how the alleged rapes occurred, and in fact, testified that they were placed in identical positions while being raped.

56. Sharon had to be prompted by the court before identifying Simmons.

57. Moreover, Karen testified that on the night of the alleged rape, she and Sharon couldn't go to the police "because we didn't know his name," but she and Sharon had previously testified that they did in fact know the "black man" as "Simmons" because had given his name to Keith Laborde.

58. Karen actually testified that Sharon and Laborde could witness the rape from inside the trunk, where Mr. Simmons had allegedly confined them at the time

59. On July 19, 1977, Simmons was tried in the 12th Judicial District Court of Avoyelles Parish and, after a trial that was over in a single day, convicted of both counts.

60. Again, under the coaching of the defendants and each of them, the Sanders twins gave nearly verbatim accounts of the alleged rape down to the positions in which each was put.

61. Simmons produced three alibi witnesses who all stated that they were present with

him at John Mose's bar on May 9, 1977 when the alleged rape occurred.

62. Defendant Eddie Knoll called a police officer to testify that he was called to John Mose's bar for an altercation and saw Simmons there on May 8, not May 9, but the May 8 date was given to him by the prosecutor and there was no police report to substantiate this alleged call.

63. Not surprisingly in the event of the suppressed Bordelon report, forensic evidence of a rape was presented at either the preliminary hearing or at trial. Nor was there any trace evidence, such as fibers, hairs, semen, blood, or skin, indicating that Mr. Simmons was ever in Keith Laborde's car.

64. Based on the defendants' fabricated evidence and suppression of evidence as aforesaid, the jury convicted Simmons of all counts against him.

65. On July 28, 1977, the 12th District Court sentenced Simmons to two consecutive 50-year prison terms, for a total of 100 years.

66. Simmons' conviction was affirmed on direct appeal by the Supreme Court of Louisiana on April 10, 1978. State v. Simmons, 357 So. 2d 517 (La. 1978).

67. Thereafter, while serving his sentence, Simmons filed numerous post-conviction motions, all of which were rejected by the courts as out of time and/or on procedural grounds.

68. Through this litigation, however, Simmons discovered the suppressed evidence concerning the lineup, the inconsistent statements of Sharon and Karen Sanders and Keith Laborde, the exculpatory medical examination conducted by Dr. Bordelon, the absence of a police report to substantiate an alleged altercation at John Mose's bar on May 8, and additional exculpatory evidence that had been withheld from him.

69. Defendants including but not limited to Eddie Knoll, Jeanette Knoll, and Riddle falsely forestalled these post-conviction motions by falsely representing that all this evidence had

in fact been disclosed to Simmons' counsel.

70. In addition, upon information and belief, defendant Eddie Knoll personally fabricated a police report concerning the alleged May 8 altercation at John Mose's bar, which he used to contend that no exculpatory evidence had been withheld. This report was examined and the authenticity of this report was later questioned by an expert.

71. On or about October 16, 2020, Simmons filed a new motion for post-conviction relief that included all the evidence of innocence discovered thus far.

72. In support of this motion, a blockbuster affidavit was given by Dana Brouilette, a cousin of the Labordes and the Sanders, who attested that on a night *other* than May 9, 1977, Keith Laborde told her that he drove a black man home and got into a fight and was thrown into the trunk of his car. He did not mention Simmons' name. Sharon and Karen, who were there, also did not mention Simmons' name and said nothing about a rape or assault.

73. Moreover, long after the trial, Keith Laborde told Brouilette that Vincent Simmons did not rape either of the sisters and that, instead, he, Keith Laborde, was the one who had consensual sex with one of them and locked the other in the trunk. Laborde was a well known rapist who had attempted to rape Dana Brouillette and her mother.

74. Upon information and belief, the Laborde family knew full well in 1977 that Keith Laborde had in fact sexually molested Karen, and that defendants John Laborde (Keith's father) and Robert Laborde (a relative) used their power under color of law to work in concert with their fellow defendants and ensure that a black scapegoat, Simmons, was accused in Keith Laborde's stead, and that through fabrication and suppression of evidence, Simmons was convicted. In fact, upon information and belief, Sheriff Didier knew Keith raped Karen and specifically questioned Karen about this during Karen's interview with the police but entirely failed to investigate Keith

Laborde as the true perpetrator.

75. Prior to the filing of the 2020 PCR motion, Karen was interviewed by licensed private investigator Brian Andrews of Lasalle Investigations, and admitted that if she, Sharon or their mother had to testify, then she would request that the court release Mr. Simmons immediately. She also admitted that she may have made a mistake in her identification of Simmons.

76. Also in preparation for the October 2020 PCR motion, the tainted identification in this case was analyzed by eyewitness identification expert Michael Leippe, who found, based on numerous factors, that the Sanders twins and Keith Laborde were highly susceptible to a confident (or motivated) misidentification.

77. These factors included: (1) that the alleged perpetrator was a stranger to the witnesses; (2) the lineup was inherently suggestive – including a white filler and Mr. Simmons in handcuffs – and made even more so by police suggestion; (3) witnessing conditions were poor; (4) there was a two-week interval between the alleged crime and the viewing; (5) that the identification was cross-racial, which is known to reduce accuracy; (6) the witnesses' inability to describe the perpetrator with any detail and/or to initially report his name to the police, suggesting that any memory formed was weak; (7) that one witness gave a description, "husky" and big-armed, that was actually at odds with the lineup; and (8) that confidence is not an indicator of accuracy, but instead indicative of previous feedback and inter-witness communication.

78. It was Dr. Leippe's opinion that the identification procedure arranged and conducted by defendants was not evidence that, standing alone without forensic corroboration, could support a criminal conviction.

79. It was also shown that Avoyelles Parish in the 1970s had a long history of racism and that, in 1977, the parish was still segregated in all but name, with white and black residents

each living separately and "knowing their place."

80. An expert report prepared by Professor Linda Lindquist Dorr after analyzing the case discussed the deep-seated American "rape myth" of African-American males as "lustful brutes" and "black beasts" who were constantly on the prowl to rape white women.

81. As shown by Professor Dorr, the rape myth pervaded every aspect of society in the South during the Jim Crow era and the period soon afterward, including 1977, amounting to an unwritten custom and practice dictating that black men were inherently rapists, that a black man accused of raping a white woman was automatically guilty, and that the conviction and punishment of the accused black man must be achieved at whatever cost.

82. The 12th District Court ordered a hearing on the motion and, during the litigation thereof, it became apparent that the District Attorney of Avoyelles Parish – namely defendant Riddle – was under a conflict of interest due to being a material witness in the case.

83. A recusal hearing was held on May 21, 2021 before the 12th District Court.

84. During the hearing, as found by the Court, defendant Riddle confirmed under oath what he and his fellow defendants had previously denied, namely that exculpatory evidence including but not limited to the aforesaid had not been disclosed to Simmons at the time of trial.

85. On February 14, 2022, after further procedural litigation, this Court granted post-conviction relief to Simmons and vacated his convictions. On the same date, the State declined to retry Simmons and the case was dismissed.

86. Later that day, Simmons was released from prison after serving 44 years, 8 months and 22 days of his 100-year sentence, the majority of that time in solitary confinement.

## COUNT I

## CLAIM UNDER 42 U.S.C. § 1983

87. The allegations of paragraphs 1 through 86 of the complaint are repeated and realleged as if fully set forth herein.

88. Defendants and each of them, individually and in concert, deprived plaintiff Simmons of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States by manner and means including but not limited to the following:

a. Concealing the fact that Keith Laborde, not Simmons, molested Sharon and Karen Sanders;

b. Arresting Simmons "on view" without probable cause;

c. Physically assaulting and shooting Simmons in order to force him to confess;

d. Arranging and conducting a blatantly unconstitutional "lineup" in which, as aforesaid, Simmons and no one else was in handcuffs, one of the fillers was white, the other fillers looked nothing like Simmons, the witnesses who viewed the lineup were explicitly told that the perpetrator was in it, and the witnesses were in the room together and allowed to talk among themselves;

e. Suppressing information about the details of the lineup;

f. Coaching Keith Laborde and the Simmons twins to identify Simmons and make consistent statements about the date and manner of the alleged rape, and suppressing their inconsistent statements;

g. Suppressing the medical examination conducted by defendant Bordelon which showed that Sharon Sanders had not been raped and that Karen Sanders had no physical injuries;

h. Concealing this exculpatory evidence not only from Simmons and his

counsel but from the grand jury, the trial jury, and indeed the prosecutor;

i. Suborning perjury and testifying falsely;

j. Making false statements to the court to defend against Simmons' post-conviction motions;

k. Personally fabricating evidence, including but not limited to a police report, to defend against Simmons' post-trial motions;

l. Amending the indictment from aggravated rape to attempted aggravated rape based upon the evidence that the defense never received in order to conceal that Sharon Sanders lied when she told investigators that she was vaginally penetrated for 30 minutes and bled inside of Keith Laborde's car

89. In effecting each of the above deprivations, defendants and each of them acted under color of state law, namely the law of the State of Louisiana.

90. In effecting each of the above deprivations, defendants and each of them were deliberately indifferent to the constitutional rights of plaintiff Simmons.

91. Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion and/or the willful failure to investigate exculpatory evidence, there was no probable cause to arrest, prosecute and convict the plaintiff.

92. Because the plaintiff's conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, any probable cause that may arguably have existed at the time of the arrest was vitiated by the time of indictment, trial and/or conviction.

93. Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate

exculpatory evidence, no presumption of regularity attaches to any act of the defendants.

94. Plaintiff's injuries were proximately caused by the aforesaid constitutional deprivations and conduct of the Defendants.

95. By reason of the foregoing, defendants and each of them are liable to plaintiff under 42 U.S.C. § 1983 in an amount to be determined by a jury.

96. Additionally, by reason of the foregoing and pursuant to 42 U.S.C. § 1988, defendants and each of them are liable to plaintiff for his reasonable legal fees and costs in prosecuting this action, in an amount to be determined by the Court.

**COUNT II**

**CLAIM UNDER 42 U.S.C. § 1983 FOR MUNICIPAL LIABILITY**

97. The allegations of paragraphs 1 through 96 of the complaint are repeated and realleged as if fully set forth herein.

98. As set forth above, certain of the individual defendants were final policymakers for their respective offices, namely, defendant Didier for the Avoyelles Parish Sheriff's Department, defendants Eddie Knoll and later Riddle for the Avoyelles Parish District Attorney's Office, defendant John Laborde for the Avoyelles Parish Assessor's office, and defendant Bordelon for the Avoyelles Parish Medical Examiner's office.

99. As set forth above, each of these defendants personally committed and directed the commission of acts that deprived plaintiff Simmons of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

100. Through their direct actions and decisions as final policymakers, these defendants intentionally, maliciously, and with reckless disregard for and deliberate indifference to the plaintiff's rights, participated in causing Simmons to be arrested without probable cause, causing

him to be physically assaulted and shot, coaching and fabricating testimony, arranging and conducting a blatantly unconstitutional identification procedure.

101. Therefore, each of the acts committed and/or directed by defendants Didier, Knoll, Riddle, John Laborde, and/or Bordelon represented the final policy of their respective offices, rendering the Avoyelles Parish District Attorney's Office and/or the Parish of Avoyelles responsible therefor.

102. In addition, the "rape myth," as aforesaid, amounted to an unwritten policy, custom and/or practice of the Parish of Avoyelles, including but not limited to its law enforcement, in or about and prior to 1977.

103. As alleged above, the rape myth pervaded every aspect of the attitudes and outlook of the defendants, and pervaded the way they viewed and fulfilled their duties as law enforcement officers, amounting to an unwritten custom within their offices.

104. It was the custom and practice of Avoyelles Parish, its law enforcement agencies, and the defendants herein, that any black man accused of raping a white woman or girl, or in this case two white girls, was guilty.

105. It was the custom and practice of Avoyelles Parish, its law enforcement agencies, and the defendants herein, that if a black man was accused of raping a white woman, his conviction must be obtained by any means necessary, fair or foul.

106. It was the custom and practice of Avoyelles Parish, its law enforcement agencies, and the defendants herein, that if securing the conviction of a black man accused of raping a white woman required witnesses to be coached, identification procedures to be rigged, testimony to be fabricated, evidence to be suppressed, and dishonest "legal" maneuvering to be conducted, then these things would be done.

107. It was the custom and practice of Avoyelles Parish, its law enforcement agencies, and the defendants herein, that once a black man was accused of raping a white woman or women, there would be no further investigation to determine whether someone else (especially someone white) might be the culprit and/or whether the alleged victims might be lying for reasons of their own.

108. Defendants and each of them were acting pursuant to the aforesaid policies, customs and/or practices when they deprived Simmons of his constitutional rights in the manner set forth above.

109. It was additionally the policy of the Parish of Avoyelles, the Avoyelles Parish Sheriff's Department, and the Avoyelles Parish District Attorney's Office in and prior to 1977 not to train their employees concerning the "rape myth," its pernicious effects on the administration of justice, and how to avoid being influenced by the myth when investigating accusations of rape against a black man.

110. The Parish of Avoyelles, the Avoyelles Parish Sheriff's Department, and the Avoyelles Parish District Attorney's Office knew to a moral certainty that their officers, employees and/or agents would confront situations conducive to applying the "rape myth" and railroading black defendants accused of raping white women.

111. The Parish of Avoyelles, the Avoyelles Parish Sheriff's Department, and the Avoyelles Parish District Attorney's Office knew that such situations would lead to difficult choices of the type that training, supervision and/or discipline would help to resolve.

112. The Parish of Avoyelles, the Avoyelles Parish Sheriff's Department, and the Avoyelles Parish District Attorney's Office knew that, in the event of an incorrect choice, a constitutional deprivation was highly likely to occur.

113. The existence of the "rape myth" and its force as an unwritten custom, practice and/or policy, including but not limited to law enforcement, may be inferred from facts and circumstances including but not limited to the historical facts and data cited by Professor Dorr in her aforementioned report, the interviews conducted in the motion picture Shadows of Doubt: State v. 85188 Vincent Simmons (1999), treatises and documents on the history of the South and Louisiana in general and the Parish of Avoyelles in particular, and other documents such as may be obtained through litigation of this matter.

114. Upon information and belief, ample other evidence of the above-stated unconstitutional patterns, practices, policies and/or customs exists, which is within the sole and exclusive knowledge of the defendants herein and which may be obtained through discovery.

115. Accordingly, defendants Parish of Avoyelles and Avoyelles Parish District Attorney's Office are liable to plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined by a jury, and are liable to plaintiff pursuant to 42 U.S.C. § 1988 for reasonable legal fees and costs in an amount to be determined by the Court.

**COUNT III**

**CLAIM FOR MALICIOUS PROSECUTION UNDER LOUISIANA STATE LAW**

116. The allegations of paragraphs 1 through 115 of the complaint are repeated and realleged as if fully set forth herein.

117. Plaintiff Simmons was subjected to an original criminal proceeding on charges of raping and/or attempting to rape Sharon and Karen Sanders.

118. Defendants and each of them charged plaintiff Simmons, and/or caused him to be charged, with the rape and/or attempted rape of Karen and Sharon Sanders.

119. The criminal proceeding was terminated in favor of plaintiff Simmons by virtue of

the vacatur of his conviction on February 14, 2022, followed by the State's decision not to retry him.

120. There was no probable cause to institute the criminal proceeding against Simmons because, as defendants knew full well, the Sanders sisters had in fact been molested by Keith Laborde and not by Simmons; they had given statements inconsistent with a rape by Simmons; they picked Simmons out of a blatantly unconstitutional lineup orchestrated by defendants; and their testimony against Simmons was coached and fabricated by defendants, all of which defendants concealed from the grand jury and trial jury.

121. Defendants acted with malice toward Simmons in that each of them knew or had reason to know, that Simmons had not raped either Karen or Sharon Sanders and that in fact there had been no rape, and that each of them had possession of evidence exculpating plaintiff, but nevertheless each of them acted with reckless and inexcusable indifference to the rights of Simmons and/or desire to scapegoat Simmons to protect Keith Laborde.

122. Had defendants not acted as aforesaid, Simmons would not have been charged, convicted, and/or imprisoned.

123. As to each action complained of, defendants and each of them acted in the course and scope of their employment with defendant Parish of Avoyelles and/or Avoyelles Parish District Attorney's Office, thus rendering the municipal defendants liable for their conduct by reason of the doctrine of respondeat superior.

124. Plaintiff suffered damages as set forth below, including but not limited to the loss of his freedom for 44 years.

125. Accordingly, defendants jointly and/or severally are liable to plaintiff for malicious prosecution under the law of the State of Louisiana in an amount to be determined by a jury.

## COUNT IV

### CLAIM FOR FALSE IMPRISONMENT UNDER LOUISIANA STATE LAW

126. The allegations of paragraphs 1 through 125 of the complaint are repeated and realleged as if fully set forth herein.

127. The person of plaintiff Vincent Simmons was detained by the defendants and each of them under color of law.

128. Defendants' detention of Simmons was unlawful because it was procured by fraud, fabrication, perjury, subornation of perjury, and suppression of evidence as aforesaid.

129. As to each action complained of, defendants and each of them acted in the course and scope of their employment with defendant Parish of Avoyelles, defendant Avoyelles Parish Sheriff's Department, and/or Avoyelles Parish District Attorney's Office, thus rendering the municipal defendants liable for their conduct by reason of the doctrine of respondeat superior.

130. Plaintiff suffered damages as set forth below, including but not limited to the loss of his freedom for 44 years.

131. Accordingly, defendants jointly and/or severally are liable to plaintiff for false imprisonment under the law of the State of Louisiana in an amount to be determined by a jury.

## COUNT V

### CLAIM FOR INTENTIONAL AND/OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS UNDER LOUISIANA STATE LAW

132. The allegations of paragraphs 1 through 131 of the complaint are repeated and realleged as if fully set forth herein.

133. The conduct of the defendants and each of them toward plaintiff Simmons, as set forth above, were extreme and outrageous.

134. The emotional distress suffered by Simmons as a result of being falsely accused of rape, arrested, beaten, shot, chained, imprisoned, falsely tried, sentenced to 100 years in prison, kept in solitary confinement for years on end, sent to a violent prison as a sex offender to be marked as a subject of harassment and violence, and generally losing his entire adult life due to a crime he did not commit, was severe.

135. The defendants and each of them intended to inflict severe emotional distress on Simmons or alternatively knew that severe emotional distress would be certain or substantially certain to result from their railroading of him for a crime he did not commit but nevertheless acted recklessly in disregard of his rights.

136. As to each action complained of, defendants and each of them acted in the course and scope of their employment with defendant Parish of Avoyelles, defendant Avoyelles Parish Sheriff's Department, and/or Avoyelles Parish District Attorney's Office, thus rendering the municipal defendants liable for their conduct by reason of the doctrine of respondeat superior.

137. Accordingly, defendants jointly and/or severally are liable to plaintiff for intentional and/or reckless infliction of emotional distress under the law of the State of Louisiana in an amount to be determined by a jury.

## COUNT VI

### DIRECT ACTION AGAINST DEFENDANTS ABC INSURANCE COMPANIES 1-10 PURSUANT TO LOUISIANA REVISED STATUTE § 22:1269

138. The allegations of paragraphs 1 through 137 of the complaint are repeated and realleged as if fully set forth herein.

139. Defendants ABC Insurance Companies 1-10, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the

Defendants named here.

140. For valuable consideration received, these policies obligated Defendant ABC Insurance Companies 1-10, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay Plaintiff.

141. By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries Plaintiff has suffered as a result.

142. Upon information and belief, Defendants ABC Insurance Companies 1-10 are contractually obligated to pay these sums on behalf of the insured Defendant(s) or are obligated to indemnify the insured Defendant(s) for these sums.

143. Upon information and belief, one or more of the insured Defendant(s) is bankrupt, insolvent, cannot be served with process, and/or deceased.

144. Upon information and belief, Defendant ABC Insurance Companies 1-10 are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

145. Accordingly, pursuant to Louisiana Revised Statute § 22:1269(B), Plaintiff brings a direct action against Defendant ABC Insurance Companies 1-10 to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## DAMAGES

146. The allegations of paragraphs 1 through 145 of the complaint are repeated and realleged as if fully set forth herein.

147. The actions of Defendants, jointly and severally, constituted torts of malicious

prosecution, false imprisonment, and intentional and/or reckless infliction of emotional distress.

148. The actions of Defendants, jointly and severally, deprived Plaintiff of his constitutional and civil rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, sections 2, 4, 12, 13, 16, 20, 22 and 24 of the Constitution of Louisiana.

149. As a direct and proximate result of Defendants' acts, Plaintiff served more than forty-four (44) years in prison.

150. As a direct and proximate result of Defendants' acts, Plaintiff served the majority of his forty-four (44) years in prison at the Louisiana State Penitentiary in Angola under conditions of solitary confinement that Amnesty International and other human rights organizations regard as tantamount to torture.

151. Plaintiff suffered a loss of job training, employment, and life opportunities during his forty-four-year incarceration.

152. Plaintiff lost the friendship and companionship of others, including his family.

153. Plaintiff has suffered mental and psychological distress as a result of being publicly and falsely prosecuted for two rapes that he did not commit; being falsely branded a sex offender; having to fear and experience violence due to being a black man falsely accused of raping two white girls; being subjected to derision and stigma from fellow inmates, guards, and the public; and fear and anxiety that he would never be able to go home and the unsettling and torturous belief that he may die in prison.

154. Plaintiff now 70 years old, faces life as an elderly person without ever being able to raise a family, have a career, accumulate savings, accumulate Social Security credit, and/or do the other things upon which Americans rely for a secure old age.

155. Therefore, as a direct and proximate result of Defendants' acts, Plaintiff suffered damages and injuries for which he is entitled to compensatory damages in an amount to be determined at trial.

156. Moreover, Defendants' acts were intentional, malicious, deliberate, reckless, wanton and/or cruel, such as to justify an award of punitive damages to Plaintiff.

157. Plaintiff furthermore suffered other injuries as set forth in the other paragraphs of this Complaint.

158. Pursuant to Louisiana Civil Procedure Article 5091(c), plaintiff requests that attorneys be appointed to represent THE UNOPENED SUCCESSION OF BURTON DAUZAT; THE UNOPENED SUCCESSION OF MELVIN VILLEMARETTE; THE UNOPENED SUCCESSION OF JOHN LABORDE; and THE UNOPENED SUCCESSION OF MARILYN LARSON BORDELON since each respective defendant is deceased and no succession representative has been appointed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Vincent Simmons requests the following relief:

A. An award of compensatory damages to Plaintiff Vincent Simmons and against Defendants, jointly and severally, in an amount to be determined at trial;

B. An award of punitive damages to Plaintiff Vincent Simmons and against Defendants, jointly and severally, in an amount to be determined at trial;

C. An award of reasonable costs and attorney's fees pursuant to 48 U.S.C. § 1988 or any other applicable law;

D. Pursuant to Louisiana Civil Procedure Article 5091(c), plaintiff requests

that attorneys be appointed to represent THE UNOPENED SUCCESSION OF BURTON DAUZAT; THE UNOPENED SUCCESSION OF MELVIN VILLEMARETTE; THE UNOPENED SUCCESSION OF JOHN LABORDE; and THE UNOPENED SUCCESSION OF MARILYN LARSON BORDELON since each respective defendant is deceased and no succession representative has been appointed; and

E. Any other relief to which Plaintiff is entitled.

## JURY TRIAL DEMAND

Plaintiff Vincent Simmons hereby demands jury trial of all issues triable to a jury.

Dated: July 5, 2022

Respectfully submitted,

/s/Malcolm X. Larvadain
Malcolm X. Larvadain, La. Bar #26,066
626 Eighth Street
Alexandria, Louisiana 71301
TEL. (318) 445-3533
FAX. (318) 445-4030
larvadain@bellsouth.net

/s/ Justin C. Bonus
Justin C. Bonus
118-35 Queens Blvd., Suite 400
Forest Hills, NY 11375
(347) 920-0160
justin.bonus@gmail.com

/s/ Jonathan I. Edelstein
Jonathan I. Edelstein
Robert Grossman
Edelstein & Grossman
501 Fifth Avenue, Suite 514
New York, NY 10017
(212) 871-0571
jonathan.edelstein.2@gmail.com

*Counsel for Vincent Simmons*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

-----------------------------------------------------------------X

VINCENT SIMMONS,
Plaintiff,

Civil Action No.

-- against --

**COMPLAINT**

**JURY TRIAL DEMANDED**

THE AVOYELLES PARISH POLICE JURY, AVOYELLES PARISH DISTRICT ATTORNEY'S OFFICE, FABIUS ANTHONY DIDIER, as the successor of the Succession of FABIUS "POTCH" DIDIER, individually and as Sheriff of Avoyelles Parish; LISA SAUCIER JUNEAU and BEAU FLOYD JUNEAU, as the successors of the Succession of FLOYD JUNEAU, individually and as a Deputy Sheriff of Avoyelles Parish; ROBERT LABORDE, individually and as a Deputy Sheriff of Avoyelles Parish; BARBARA DECUIR-WALKER, individually and as a Deputy Sheriff of Avoyelles Parish; THE UNOPENED SUCCESSION OF BURTON DAUZAT, individually and as a Deputy Sheriff of Avoyelles Parish; THE UNOPENED SUCCESSION OF CAPT. MELVIN VILLEMERETTE, individually and as a Deputy Sheriff of Avoyelles Parish; THE UNOPENED SUCCESSION OF JOHN LABORDE, individually and as Avoyelles Parish Assessor; THE UNOPENED SUCCESSION OF MARILYN LARSON BORDELON, as the successor of the Succession of DR. FILMORE PAUL "F.P." BORDELON, individually and as Avoyelles Parish Coroner; JEROLD EDWARD "EDDIE" KNOLL, individually and as Avoyelles Parish District Attorney; ALICIA JEANETTE THERIOT KNOLL, individually and as an Assistant District Attorney of Avoyelles Parish; CHARLES ADDISON RIDDLE III, individually and as District Attorney of Avoyelles Parish; JOHN/JANE DOE NOS. 1 through 20, being unknown officers, employees and/or agents of the Parish of Avoyelles; JOHN/JANE DOE NOS. 21 through 40, being

unknown officers, employees and/or agents of the Avoyelles Parish District Attorney's Office; and ABC INSURANCE COMPANIES 1-10,

Defendants.

**ORDER**

**CONSIDERING THE FOREGOING:**

**IT IS ORDERED** that ___________________ be appointed to represent THE UNOPENED SUCCESSION OF BURTON DAUZAT.

**IT IS FURTHER ORDERED** that __________________ be appointed to represent THE UNOPENED SUCCESSION OF MELVIN VILLEMARETTE.

**IT IS FURTHER ORDERED** that ___________________ be appointed to represent THE UNOPENED SUCCESSION OF JOHN LABORDE.

**IT IS FURTHER ORDERED** that ___________________ be appointed to represent THE UNOPENED SUCCESSION OF MARILYN LARSON BORDELON.

**THUS DONE AND SIGNED** this ______ day of ___________, 2022.

___________________________

**JUDGE**